## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MATTHEW AMICO, DEVON EDLIN, HENRICK HAMBERG, TIFFANY HAYES, ROSEANNE HUNTER, and CHRISTOPHER LANDRY,<br><br>       Plaintiffs,<br><br> v.<br><br>RELIANT REHABILITATION HOLDINGS, INC., HIG CAPITAL LLC, MARQUIS HEALTH SERVICES, and TRYCO PARTNERS LLC,<br>        Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT .................................................................................................. 1

JURISDICTION AND VENUE ................................................................................................. 5

PARTIES ...................................................................................................................................... 5

THE FEDERAL FALSE CLAIMS ACT..................................................................................... 9

THE MEDICARE PROGRAM ................................................................................................. 12

    Medicare Coverage Requirements ................................................................................ 12

    Medicare Reimbursement for SNF Care ...................................................................... 14

FACTS AND ALLEGATIONS................................................................................................. 20

    Defendant Reliant Rehabilitation's Policies and Practices to Generate Inappropriate, Unnecessary

        and Unreasonable Therapy Services ..................................................................... 20

    Defendant Marquis Health Services' Knowing Involvement in the Scheme to Submit False and

        Fraudulent Medicare Claims .............................................................................. 25

    Examples of False and/or Fraudulent Therapy Billings................................................ 27

    Prohibited Retaliation Against Relators by Reliant Rehabilitation and Marquis Health Services.... 37

CLAIMS FOR RELIEF ............................................................................................................. 47

    Count One - Federal False Claims Act – False Claims ................................................ 47

    Count Two - Federal False Claims Act – False Records or Statements........................... 47

    Count Three - Federal False Claims Act – Reverse False Claims.................................... 48

    Count Four - Federal False Claims Act - Conspiracy .................................................. 49

CLAIMS FOR RELIEF ON BEHALF OF THE RELATORS PERSONALLY........................ 50

    Federal and State Law Prohibiting Retaliation ........................................................... 50

    Count Five - Retaliation Against Relator Matthew Amico

        In Violation of The False Claims Act ................................................................. 51

    Count Six - Retaliation Against Relator Matthew Amico

        In Violation of Mass Gen. Laws ........................................................................ 52

    Count Seven - Retaliation Against Relator Devon Edlin

        In Violation of The False Claims Act ................................................................. 53

    Count Eight - Retaliation Against Relator Devon Edlin

        In Violation of Mass Gen. Laws ........................................................................ 54

    Count Nine - Retaliation Against Relator Henrick Hamberg

        In Violation of The False Claims Act ................................................................. 55

Count Ten - Retaliation Against Relator Henrick Hamberg

    In Violation of Mass Gen. Laws ................................................................. 55

Count Eleven - Retaliation Against Relator Tiffany Hayes

    In Violation of The False Claims Act ....................................................... 56

Count Twelve - Retaliation Against Relator Tiffany Hayes

    In Violation of Mass Gen. Laws ................................................................. 57

Count Thirteen - Retaliation Against Relator Roseanne Hunter

    In Violation of The False Claims Act ....................................................... 58

Count Fourteen - Retaliation Against Relator Roseanne Hunter

    In Violation of Mass Gen. Laws ................................................................. 59

Count Fifteen - Retaliation Against Relator Christopher Landry

    In Violation of The False Claims Act ....................................................... 60

Count Sixteen - Retaliation Against Relator Christopher Landry

    In Violation of Mass Gen. Laws ................................................................. 60

PRAYERS FOR RELIEF ................................................................................................. 61

JURY DEMAND ............................................................................................................... 63

## INTRODUCTORY STATEMENT

1.      This is an action brought on behalf of the United States by *qui tam* relators Matthew Amico, Devon Edlin, Henrick Hamberg, Tiffany Hayes, Roseanne Hunter, and Christopher Landry ("Relators" or "Plaintiffs-Relators") against Reliant Rehabilitation Holdings, Inc. and Marquis Health Services and their respective parent companies ("Defendants") to recover damages, penalties, attorneys' fees and costs, and other relief pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 and the Patient Protection and Affordable Care Act of 2010. Each individual Relator further seeks to recover damages from Defendants for personal claims of retaliation and wrongful termination.

2.      Defendant Reliant Rehabilitation Holdings, Inc. ("Reliant Rehabilitation" or "Reliant") is a national provider of contract rehabilitation management services headquartered in Plano, Texas. Through its over 9,000 employees, Reliant Rehabilitation provides physical, occupational, and speech therapy services for thousands of patients each day at more than 800 facilities located in 40 states, including patients residing at skilled nursing facilities owned and operated by Defendant Marquis Health Services.  *See https://reliant-rehab.com/about-us/* (last visited on 10/31/2018).

3.      In December 2017, Marquis Health Services ("Marquis") announced that it had contracted with Reliant Rehabilitation to provide therapy services at 18 of its skilled nursing and rehabilitation facilities in the Northeast and Mid-Atlantic regions, totaling more than 2,400 beds. *See http://www.caryl.com/marquis-health-services-announces-partnership-reliant-rehabilitation-enhance-therapy-services-skilled-nursing-facilities* (last visited 10/31/2018).  A significant portion of the therapy services provided by Reliant Rehabilitation to patients residing at Marquis facilities are billed to Medicare.

4.       Beginning in or about December 2017, and continuing through in or after November 2018, Reliant Rehabilitation and its parent company, HIG Capital LLC, and Marquis Health Services and its parent company Tryko Partners LLC, engaged in various schemes to submit and to cause the submission of false and fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur as reported.   The fraudulent schemes include:

- Presumptively placing patients covered by Medicare Part A in the highest Resource Utilization Group ("RUG") for therapy services, instead of conducting evaluations of each patient to determine the appropriate level and type of therapy services based on that patient's individual clinical needs, in order to maximize reimbursement levels and billing revenues;

- Providing inappropriate, unnecessary, and unreasonable amounts of therapy services to patients, and arbitrarily shifting between therapy disciplines, to ensure that targeted therapy reimbursement levels and billing revenues are achieved, without regard to the clinical needs of the individual patients;

- Falsifying treatment records for patients covered by Medicare Part A, and adding entries for therapy services that are never provided, to ensure that targeted therapy reimbursement levels in the highest RUG are achieved;

- Grouping patients covered by Medicare Part B for inappropriate, unnecessary, and unreasonable therapy services, which groups are created to maximize reimbursement levels and billing revenues, without regard to the clinical needs or the mental or physical abilities of the individual patients;

- Reporting and billing for therapy services when, in fact, the patients are asleep or otherwise physically or mentally unable to participate in, or to benefit from, therapy services;

- Pressuring employees and contractors to inflate and to round up therapy treatment minutes, instead of reporting the actual minutes of therapy services provided, to ensure that targeted therapy reimbursement levels and billing revenue are achieved;

- Misreporting time spent on initial evaluations as time spent providing therapy services;

- Issuing false physician certification and recertification statements to support therapy services;

- Scheduling and reporting therapy services to patients to ensure targeted reimbursement levels are achieved, even after the patients' treating therapists has recommended that the patients be discharged from therapy; and

- Arbitrarily extending patient discharge dates to ensure that targeted therapy reimbursement levels and billing revenue are achieved.

5.      Defendants engaged in one or more of these schemes, and conspired to do the same, at skilled nursing facilities located in Massachusetts and throughout the United States. Furthermore, defendant Reliant Rehabilitation engaged in similar misconduct with other skilled nursing facilities across the country at which it provides contract rehabilitation management services.

6.      Defendants' conduct alleged herein violates the Federal False Claims Act.  The Federal False Claims Act ("FCA") was originally enacted during the Civil War to deal with unscrupulous military contractors.  Congress substantially amended the FCA in 1986—and, again, in 2009 and 2010—to enhance the ability of the Government to recover losses sustained as a result of fraud against it. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

7.      The FCA prohibits, *inter alia*: knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A); knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B); knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, 31 U.S.C. §

3729(a)(1)(G); and knowingly conspiring to do any of these acts,  31 U.S.C. § 3729(a)(1)(C). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133, *available at* https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penalties-inflation-adjustment-for-2017.

8.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the Government, and to share in any recovery.  The FCA requires that the Complaint be filed under seal (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. The person bringing the action is known under the FCA as the "Relator."

9.     Pursuant to the False Claims Act, *qui tam* Plaintiffs-Relators seek, through this action, to recover damages and civil penalties arising from Defendants' knowing fraud against the Medicare program, which fraud has resulted in millions of dollars in estimated losses to the United States. Prior to the filing of this Complaint, Relators made substantive disclosures to the Government of facts and evidence underlying the allegations in this Complaint.

10.     The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4). In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of this Complaint, each Relator is an "original source" as that term is used in the FCA.

11.     This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345

and 31 U.S.C. § 3732, which confer jurisdiction over actions brought under the False Claims Act

pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has original and supplemental jurisdiction

over the State law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because those

claims arise from the same transaction or occurrence as the claims brought on behalf of the

United States under 31 U.S.C. § 3730.

13.    This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C.

§ 3732(a) because each Defendant resides in, transacts substantial business in and/or has

committed acts related to the allegations in the Complaint in the District of Massachusetts.

14.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §

1391, and 28 U.S.C. § 1395(a), because each Defendant resides in and/or transacts business in

this District by, among other things, creating and submitting false and fraudulent Medicare

claims.

## PARTIES

15.    Plaintiff the United States of America is the real party in interest with respect to

the False Claims Act *qui tam* claims asserted herein pursuant to 31 U.S.C. § 3730(b).  The

United States, acting through the Department of Health and Human Services, administers the

Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk.

Plaintiffs-Relators are the real party in interest in their remaining wrongful termination and

retaliation claims asserted herein pursuant to 31 U.S.C. § 3730(h) and the laws of the

Commonwealth of Massachusetts.

16.    Plaintiff-Relator Matthew Amico is a resident of Worcester County,

Massachusetts who worked as a Physical Therapy Assistant for Reliant Rehabilitation at the

Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts. Relator Matthew Amico has personal and direct knowledge of Defendants' fraudulent schemes to create and submit false and/or fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur.  After objecting to Defendants' fraudulent practices, Relator Matthew Amico was terminated from his position as a Physical Therapy Assistant in September 2018.

17.     Plaintiff-Relator Devon Edlin is a resident of Worcester County, Massachusetts who worked as an Occupational Therapy Assistant for Reliant Rehabilitation at the Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts. Relator Devon Edlin has personal and direct knowledge of Defendants' fraudulent schemes to create and submit false and/or fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur.  After objecting to Defendants' fraudulent practices, Relator Devon Edlin was terminated from her position as an Occupational Therapy Assistant in October 2018.

18.     Plaintiff-Relator Henrick Hamberg is a resident of Middlesex County, Massachusetts who worked as a Physical Therapy Assistant for Reliant Rehabilitation at the Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts. Relator Henrick Hamberg has personal and direct knowledge of Defendants' fraudulent schemes to create and submit false and/or fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur.  After objecting to Defendants' fraudulent practices, Relator Henrick Hamberg was terminated from his position as a Physical Therapy Assistant in August 2018.

19.     Plaintiff-Relator Tiffany Hayes is a resident of Worcester County, Massachusetts who worked as the Director of Rehabilitation and as an Occupational Therapist for Reliant Rehabilitation at the Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts. Relator Tiffany Hayes has personal and direct knowledge of Defendants' fraudulent schemes at the River Terrace facility, and at similar skilled nursing facilities across the Marquis system, to create and submit false and/or fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur. After objecting to Defendants' fraudulent practices, Relator Tiffany Hayes was terminated from her position as an Occupational Therapist in July 2018.

20.     Plaintiff-Relator Roseanne Hunter is a resident of Middlesex County, Massachusetts who worked as a Rehabilitation File Clerk for Reliant Rehabilitation at the Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts. Relator Roseanne Hunter has personal and direct knowledge of Defendants' fraudulent schemes to create and submit false and/or fraudulent claims to Medicare for therapy services that were unreasonable, unnecessary, or that simply did not occur.  After objecting to Defendants' fraudulent practices, Relator Roseanne Hunter was terminated from her position as a Rehabilitation File Clerk in July 2018.

21.     Plaintiff-Relator Christopher Landry is a resident of Worcester County, Massachusetts who worked as the Director of Rehabilitation and as an Occupational Therapist for Reliant Rehabilitation at the Marquis Health Services River Terrace skilled nursing facility in Lancaster, Massachusetts.  Relator Christopher Landry has personal and direct knowledge of Defendants' fraudulent schemes at the River Terrace facility, and at similar skilled nursing facilities across the Marquis system, to submit false and/or fraudulent claims to Medicare for

therapy services that were unreasonable, unnecessary, or that simply did not occur.  After objecting to Defendants' fraudulent practices, Relator Christopher Landry was removed from his position as the Director of Rehabilitation Services and was thereafter terminated from that position in July 2018.

22.    Defendant Reliant Rehabilitation Holdings, Inc. is a limited liability company organized under the laws of the State of Delaware and headquartered in Plano, Texas.  Reliant Rehabilitation provides contract rehabilitation management services to acute care hospitals, skilled nursing facilities, subacute facilities, long term acute care hospitals, rehabilitation hospitals, and continuing care rehabilitation hospitals.  According to its website, Reliant Rehabilitation has approximately 9,000 employees who currently serve more than 800 facilities located in 40 states and accounts for more than 30,000 "patient encounters" every day.  *See https://reliant-rehab.com/about-us/* (last visited on 10/31/2018).

23.    Defendant HIG Capital, LLC is a global private equity firm organized under the laws of the State of Delaware and headquartered in Miami, Florida.  In September 2018, HIG Capital LLC acquired Reliant Rehabilitation Holdings, Inc.  In announcing that acquisition, HIG Capital stated "Reliant differentiates itself by possessing best-in-class therapist recruitment, program performance management, customer marketing support and industry-leading compliance systems."  *See* https://higcapital.com/news/release/1119 (last visited 11/07/2018).

24.    Defendant Tryko Partners LLC, is a private equity group organized under the laws of the State of New Jersey and headquartered in Brick, New Jersey.   According to its website, Tryko Partners focuses on "multifamily properties, healthcare facilities and service entities, and tax liens along the Eastern Seaboard and in the Midwest."  *See* http://tryko.com/ (last visited 11/07/2018).

25.     Defendant Marquis Health Services is a division of defendant Tryko Partners, LLC. As stated on the Marquis' website, "Because rehabbing care is who we are and what we do, our rapidly growing organization has distinguished itself in revolutionizing Healthcare Facilities throughout the Northeast.…" *See* https://mhslp.com/ (last visited 11/07/2018).  In December 2017, Marquis Health Services announced that it had contracted with Reliant Rehabilitation to provide rehabilitation therapy services at 18 of its skilled nursing and rehabilitation facilities totaling more than 2,400 beds.  *See http://www.caryl.com/marquis-health-services-announces-partnership-reliant-rehabilitation-enhance-therapy-services-skilled-nursing-facilities* (last visited 10/31/2018).

26.     Defendant Marquis Health Services owns and operates skilled nursing facilities located in Beverly, Boston, Danvers, Holyoke, Lancaster, Methuen, Needham, Rockland, and Saugus, Massachusetts, as well as facilities located in Maryland, New Jersey, Pennsylvania, and Rhode Island. *See* https://mhslp.com/locations/ (last visited 11/07/2018).

27.     Marquis Health Services, and similar Reliant clients located across the country, submit reimbursement claims to Medicare based on the therapy services provided, or allegedly provided, by Reliant Rehabilitation.

## THE FEDERAL FALSE CLAIMS ACT

28.     The False Claims Act ("FCA") was originally enacted during the Civil War to deter unscrupulous military contractors. Congress substantially amended the FCA in 1986—and, again, in 2009 and 2010—to enhance the ability of the Government to recover losses sustained as a result of fraud against it.

29.     The FCA creates liability for "any person who," among other things:

>   "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

"conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

30.    The FCA provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the civil monetary penalty is increased periodically, for example, it was increased in 2017 to a maximum of $21,916 for each violation. 31 U.S.C. § 3729(a)(1); 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017).

31.    The FCA further provides that "the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that the defendant specifically intended to commit fraud. *Id*. Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean "knowing" or "knowingly" as defined in the FCA.

32.    The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United

States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2).

    33.    The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3)  (emphasis added). In the health care context, such as Medicare and Medicaid, the term "obligation" is further defined as "Any overpayment retained by a person after the deadline for reporting and returning the overpayment…is an obligation (as defined [in the FCA])", and an overpayment must be reported "By the later of …60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." Patient Protection and Affordable Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar. 23, 2010), Section 6404(a), codified at 42 U.S.C. § 1128J9(d). *See also* 42 U.S.C. § 1320a-7k(d).

    34.    The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

## THE MEDICARE PROGRAM

### Medicare Coverage Requirements

35.     Congress established The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. ("Medicare"), in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A. Medicare is a health insurance program administered by the United States Government, funded by taxpayer revenue. The United States Department of Health and Human Services ("HHS"), through its Centers for Medicare and Medicaid Services ("CMS"), oversees Medicare.

36.     The Medicare program is divided into four "parts" (Parts A, B, C, and D) that cover different services.  Subject to certain conditions, Medicare Part A generally covers rehabilitation care and skilled therapy services for up to 100 days of care in a skilled nursing facility ("SNF") for a benefit period (i.e., spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).  Among the conditions that Medicare imposes on its Part A SNF benefit are that:  (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

37.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and re-certify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter.  *See* 42

U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

38.     Medicare Part B—a.k.a. medical insurance -- generally covers portions of the cost of certain medically necessary services including physical, occupational, and speech therapy treatment, subject to certain deductibles and co-payments.  *See* Medicare Benefit Policy Manual, Ch. 8, §§ 10.2 & 30.2. Medicare Part B also covers therapy services to beneficiaries residing in a SNF whose benefit periods are exhausted or who are not otherwise entitled to payment under Part A.  *See* Medicare Benefit Policy Manual, Ch. 8, §§ 50 & 70; Medicare Claims Processing Manual, Chapter 25.

39.     To be considered "skilled," a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists.  *See* 42 C.F.R. § 409.31(a).

40.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking).  *See* 42 C.F.R. § 409.33(d).  "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g. aides or nursing personnel… ."  Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

41.     Medicare covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury."  *See* 42 U.S.C. § 1395y(a)(1)(A).  In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the

nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

42.     Under either Part A or Part B, medical providers are not permitted to bill the government for medically unnecessary services, which includes services that harm a patient or are performed for no reason other than obtaining a profit. *See, e.g., United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000) (services billed to Medicare must be reasonable and medically necessary, and they must be provided economically; procedures chosen solely for defendants' economic gain and that were deleterious and inferior are not medically necessary).

43.     In order to make it possible to assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

**Medicare Reimbursement for SNF Care**

44.     Under its prospective payment system ("PPS"), Medicare pays a SNF a daily rate for each day of skilled nursing and rehabilitation services provided to a patient.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).  The rate is based, in part, on the patient's anticipated "need for skilled nursing care and therapy."  Final Rule for Medicare Program's Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities, 64 Fed. Reg. 41,644 (July 30,

-14-

1999).  Specifically, the daily PPS rate that Medicare pays a SNF depends on the Resource

Utilization Group ("RUG") to which a patient is assigned, and each distinct RUG is intended to

reflect the anticipated costs associated with providing nursing and rehabilitation services to

beneficiaries with similar characteristics or resource needs.  There are five general RUG levels

for those beneficiaries who require special rehabilitation therapy:  Rehab Ultra High (known as

"RUC"), Rehab Very High ("RVC"), Rehab High ("RHC"), Rehab Medium ("RMC"), and

Rehab Low ("RLA or RLB").

  45.  The rehabilitation RUG level to which a patient is assigned depends upon the

number of skilled therapy minutes and the number of therapy disciplines the patient received

during a seven-day assessment reference period (also known as the "look back period").  The

chart below reflects the requirements for the five general rehabilitation RUG levels and the

corresponding daily reimbursement rates during federal fiscal year 2018:

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Daily Reimbursement Rate[1] |
|---|---|---|
| Ultra High (RUC) | At least 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $693.45 |
| Very High (RVC) | Between 500 and 719 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $594.90 |
| High (RHC) | Between 325 and 499 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $518.37 |
| Medium (RMC) | Between 150 and 324 minutes per week total therapy; therapy must be provided at least 5 days per week but can be any mix of disciplines | $455.40 |

---

[1] The quoted rates are for SNFs located in Worcester County, Massachusetts.  The 2018 daily reimbursement rate for rehabilitation at the Ultra High RUC rate in Massachusetts ranged from $615.44 in Hampden and Hampshire Counties to $758.27 in Barnstable County.

| Low (RLA or RLB) | Minimum 45 minutes per week total therapy; therapy must be provided at least 3 days per week but can be any mix of disciplines | $442.76 |

82 Fed. Reg. 36530 (Aug. 4, 2017).

46.     The Ultra High RUG level for specialized rehabilitation ("RUC") is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998). In announcing the final PPS rule for SNFs, CMS further explained that the RUG system "uses minimum levels of minutes per week as qualifiers…These minutes are minimums and are not to be used as upper limits for service provision…Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements…and will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

47.     A nursing facility must determine each patient's RUG as of specific "assessment reference dates" ("ARDs"), and the RUG as of the ARD then determines the daily reimbursement rate prospectively for a specific timeframe. Beginning in 2011, the Medicare assessment schedule was as follows:

| RUG Assessment Type | Assessment Reference Date Window (including grace days) | Medicare Payment Days Determined by RUG |
| --- | --- | --- |
| 5 day | Days 1-8 | Days 1-14 |
| 14 day | Days 11-19 | Days 15-30 |
| 30 day | Days 21-34 | Days 31-60 |
| 60 day | Days 50-64 | Days 61-90 |
| 90 day | Days 80-94 | Days 91-100 |

76 Fed. Reg. 26,364, 26,389 (May 6, 2011).

48.     SNFs report therapy treatment times for each assessment reference period on a

Minimum Data Set ("MDS") form that is completed as of each ARD in a patient's stay.  *See* 64

Fed. Reg. at 41,661; 42 C.F.R. § 413.343.  Since October 1, 2010, SNFs transmit the MDS data

directly to CMS.  42 C.F.R. § 483.20(f)(3).  Completion of the MDS is a prerequisite to payment

under Medicare.  *See* 63 Fed. Reg. at 26,265.  The MDS form requires a certification by the

provider stating, in part: "To the best of my knowledge, this information was collected in

accordance with applicable Medicare and Medicaid requirements.  I understand that this

information is used as a basis for ensuring that residents receive appropriate and quality care, and

as a basis for payment from federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home

Resident Assessment and Care Screening.

49.     A patient's RUG information is also incorporated into the Health Insurance

Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment

amount owed to the nursing facility.  The HIPPS code must be included on the CMS-1450 form,

which SNFs submit monthly to Medicare via intermediaries known as Medicare Administrative

Contractors that process and pay Medicare claims.  *See* Medicare Claims Processing Manual, Ch.

25, § 75.5.

50.     Prior to the commencement of therapy in any discipline, a therapist certified in

that discipline must evaluate the patient and develop a treatment plan that is approved by a

physician.  *See* 64 Fed. Reg. at 41,660-61; 42 C.F.R. §§ 409.17, 409.23.  The therapy time

reporting rules make clear that "[t]he time it takes to perform the formal initial evaluation and

develop the treatment goals and the plan of treatment may not be counted as minutes of therapy

received by the beneficiary."  64 Fed. Reg. at 41,661; *see also* RAI Manual, Ch. 3 at O-19 (Oct.

2014) ("The therapist's time spent on documentation or on initial evaluation is not included.").

-17-

HHS has explained that "[t]his policy was established because we do not wish to provide an incentive for facilities to perform initial evaluations for therapy services for patients who have no need of those specialized services." 64 Fed. Reg. at 41,661. The purpose, however, is not to deprive providers of compensation for performing initial evaluations, because "the cost of the initial assessment is included in the payment rates for all Medicare beneficiaries in covered Part A SNF stays." *Id.* at 41661-62.

51.    Concurrent therapy is the treatment of two residents at the same time who are not performing the same or similar activities. *See* 74 Fed. Reg. at 40,315. Until October 1, 2010, if a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a SNF could attribute 60 minutes to each patient when determining each patient's RUG level. Effective October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if 60 minutes of concurrent therapy were provided, the SNF could attribute only 30 minutes to each beneficiary. *Id.* at 40,318-19.

52.    In group therapy, a single therapist conducts the same or similar therapy exercises with two to four beneficiaries at the same time. *See* 76 Fed. Reg. 48,486, 48,516 (Aug. 8, 2011) (clarifying that, after October 1, 2011, group therapy must be planned for four patients). Group therapy should be initiated only after determining that the patient can benefit from therapy provided in a group setting and that the group therapy is necessary and appropriate for the patient. 76 Fed. Reg. at 48,514. "Therapists should document how the prescribed type and amount of group therapy will meet the patient's needs and assist the patient in reaching the documented goals." *Id.* Effective October 1, 2011, the group therapy time-reporting rules changed: under the new rules, group therapy must be intended for four patients, and the relevant

MDS form for each of those patients should reflect one-fourth of the total time spent by the

therapist in the group session.  *See* 76 Fed. Reg. at 48,513-14.

53.    Also effective October 1, 2011, the Medicare rules imposed a further requirement

that SNFs report a so-called Change of Therapy ("COT") if, after an assessment for a particular

patient, "the intensity of therapy (that is, the total reimbursable therapy minutes . . .) changes to

such a degree that it . . . no longer reflect[s] the RUG[] classification and payment assigned" for

that patient. 76 Fed. Reg. at 48,518.  Specifically, at the end of each 7-day period after an

assessment, if the therapy delivered during that period does not match the last reported RUG,

then the SNF must report the actual level of therapy being delivered in a COT, and the

reimbursement for that patient's care will be adjusted accordingly.  *See id*. at 48,518-26.  For

practical purposes, this change turned every week into a new look back period.

54.    SNFs and other health care providers must certify that services or items ordered

or provided to patients will be provided "economically and only when, and to the extent,

medically necessary" and "will be of a quality which meets professionally recognized standards

of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C.

§ 1320c-5(a)(1)-(3).   Medicare will not pay claims for medically unnecessary services.

55.    In order to submit reimbursement claims to Medicare, each SNF must submit a

Medicare Enrollment Application in which the SNF certifies, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this provider…I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction complying with such
> laws, regulations, and program instructions (including, but not limited to, the
> Federal anti-kickback statute and the Stark law), and on the provider's compliance
> with all applicable conditions of participation in Medicare.

*See* CMS Form 855A.  Medicare claims that violate these certifications are false or fraudulent

claims under the False Claims Act.

## FACTS AND ALLEGATIONS

**Defendant Reliant Rehabilitation's Policies and Practices to Generate Inappropriate, Unnecessary and Unreasonable Therapy Services**

56.     As noted above, in December 2017, Marquis Health Services announced that it had contracted with Reliant Rehabilitation to provide therapy services at 18 of Marquis' skilled nursing and rehabilitation facilities serving some 2,400 residential patients, many of them covered by Medicare.  Following that announcement, Reliant and Marquis implemented a system to fraudulently increase their revenues and their profits using unnecessary and unreasonable physical, occupational and speech therapy services to falsely inflate the daily per patient reimbursement rates billed to Medicare.  The fraudulent schemes showed every indication of being imported into the Marquis Health Services system by Reliant Rehabilitation based upon the "rehabilitation management services" Reliant has been providing at other skilled nursing facilities across the country for many years.

57.     Beginning in December 2017, Reliant Rehabilitation assigned a Director of Rehabilitation ("DOR") with responsibility for each of 18 facilities owned and operated by Marquis Health Services.   Each of the individual Reliant DORs reported to a Reliant Regional Director of Operations and to other senior Reliant officials based in Plano, Texas.   Over the course of 2018, Relator Tiffany Hayes and Relator Christopher Landry both served as the Reliant DOR assigned to the Marquis River Terrace facility in Lancaster, Massachusetts. Both were eventually terminated for questioning and contesting Reliant Rehabilitation's fraudulent practices.  By early July 2018, Reliant assigned a new DOR to the River Terrace who proved fully capable of implementing those same fraudulent practices.

58.     The Reliant DORs are responsible for coordinating the evaluation of patients at Marquis Health Services' facilities and for formulating plans of care for skilled physical, occupational, and speech therapy services. The Reliant DORs create both a planned ARD and a planned RUG for each patient, and thereafter plot schedules out so that the projected RUG is achieved by the next ARD.  This information is maintained on an electronic patient record system known as Rehab Optima, and is monitored by Reliant officials in Texas, often on a daily basis.

59.     Reliant DORs are pressured by senior Reliant Rehabilitation officials to place as many Medicare patients as possible in the highest available RUG category.  For individuals covered by Medicare Part A, the Reliant DORs are expected to place those patients in the Ultra High RUC category without regard to the patient's clinical needs, and to thereafter devise care plans that result in 720 minutes of therapy per week. When the DOR evaluates a Medicare Part A patient and determines that treatment at the RHC or RVC level is appropriate, the Reliant Regional Director of Operations simply access the plan of care records in the Rehab Optima system and fraudulently increase the prescribed therapy to 720 minutes, so that Marquis Health Services can falsely bill Medicare at the Ultra RUC category for that patient.

60.     To ensure that Medicare could be billed at the Ultra RUC rate, as expected and demanded by senior Reliant Rehabilitation officials, certain DORs falsely add minutes to treatment records of patients covered by Medicare Part A, or misreport evaluation time or time conferring with family members as treatment time, to reach the 720 minute minimum during the relevant look back period.

61.     If Reliant officials determine that a Medicare Part A patient will not receive the prescribed number of minutes in physical, occupational or speech therapy during the relevant

period, the DOR increases the number of prescribed minutes in one of the other therapy disciplines.  This arbitrary shifting between therapy disciplines occurs without regard to whether the increased treatment is "medically necessary" for that patient, to ensure that total therapy provided reaches 720 minutes, so that Marquis Health Services can falsely bill Medicare at the Ultra RUC category for that patient.

62.    Senior Reliant Rehabilitation officials also encourage and direct DORs to schedule Medicare patients for artificially long therapy sessions from Monday to Friday, in order to save Reliant the cost of paying therapists higher rates for working on Saturdays and Sundays.  The extended therapy sessions are imposed by Reliant officials without regard to the clinical needs, or the physical stamina or mental abilities, of the patients.   In situations where the DOR sought authorization to provide therapy services to a specific patient on a Saturday or a Sunday, the senior Reliant Officials responded "if more groups and overlapping treatments were occurring the need for overtime would not be there" confirming that Reliant focuses solely on the aggregate profitability of the Marquis facility, without regard for the clinical needs of the individual patients.

63.    Senior Reliant Rehabilitation officials also encourage and direct DORs to create plans of care and to set schedules for Medicare Part A patients to receive only the minimum amount of 720 minutes needed to qualify for reimbursement at the Ultra High RUG category during the relevant time period.  The Reliant officials actively monitor patient treatment records to detect any "overages" of therapy services provided to Medicare Part A patients.  For example, the Reliant Regional Director of Operations for the Marquis system insisted that each of her DORs monitor the aggregate amounts of therapy provided to Part A patients "multiple times a day . . . to ensure that you are not providing significant over delivery of minutes."

64.    Reliant Rehabilitation uses a metric known as "Salary to Income" or "S/I" to track the productivity of each DOR and each therapist.  In April 2018 the Reliant Regional Director of Operations ("RDO") sent a message to all Reliant employees and contractors across the Marquis Health System network reminding them that "moving productivity . . . is the biggest key to your departments financial health and growth."  The Reliant RDO then announced a so-called "productivity competition" which promised members of the winning team (as measured by increased S/I levels) the chance to win prizes such as team lunches or Beats audio speakers.

65.    The following month, the Reliant Regional Director of Operations awarded cash amounts of between $250 and $600 to individual DORs at four Marquis Heath Services facilities.  The cash payments were openly identified as rewards for increasing the S/I productivity levels of the therapists at the four Marquis facilities during May 2018.  The Regional Director of Operations sent notice of those awards to each of her DORs across the Marquis system with the exhortation "I know we can have more people bonus for the month of June!!"

66.    When the promise of cash prizes and free audio speakers failed to bring about the increased Medicare billing levels they sought, Reliant Rehabilitation officials took a different approach and imposed minimum S/I productivity levels on every therapist assigned to a Marquis Health Services facility, including the individual DORs.   The Reliant Reginal Director of Operations informed the DORs that the productivity levels of individual therapists "absolutely has to be your focus every day."

67.    Between May 2018 and July 2018, Reliant Rehabilitation raised the required S/I productivity level for each therapist from 85% to 90% and, thereafter, to 93%. The Reliant Regional Director of Operations attempted to enlist the efforts of the DORs in exacting these

-23-

unrealistic productivity levels from individual therapists by reminding them "Remember there is money on the line…I WANT TO PAY PEOPLE!!!"    In the same communication, the Reliant Regional Director of Operations provided the DORs with examples of how individual therapists could be expected to reach S/I levels of *as high as 128%* by aggressively, and fraudulently, using grouping to increase the total number of minutes billed.

68.    The Reliant Regional Director of Operations also demanded that she receive immediate written notification if any individual therapist fell below Reliant's corporate S/I productivity levels, warning that such individuals would be "subject to [Reliant's] progressive performance correction process."  In practice, the unrealistic productivity demands could be met on many days only by forcing therapists to "round up" treatment minutes and to misreport time transporting patients, time preparing treatment equipment, time moving between rooms, or time taking bathroom breaks as time providing therapy services.  This was the exact result Reliant Rehabilitation was seeking.

69.    The Reliant Regional Director of Operations also mandate that each facility create between four and six therapy groups for patients covered by Medicare Part B as a means of improving "financial management."  Reliant DORs are instructed to schedule non Medicare A patients for grouped therapy without regard to whether patients can benefit from therapy provided in a group setting or whether the group therapy is necessary or appropriate. Senior Reliant officials insist that patients covered by Medicare Part B be placed in group therapy treatment sessions without the authorization of, and over the objection of, the patients, their families and their health care proxies.

70.    The Reliant Regional Director of Operations touted the "use of groups and overlapping treatments" as a means for individual therapist to meet their targets of billing 7.5

hours of therapy each day and satisfying the productivity requirements Reliant demanded.  The

Reliant Regional Director of Operations directed Relator Landry that "despite your therapists

objections" patient grouping "must be done."

### Defendant Marquis Health Services' Knowing Involvement in the Scheme to Submit False and Fraudulent Medicare Claims

71.    After announcing its "partnership" with Reliant Rehabilitation in December 2017,

Marquis Health Services encouraged and allowed Reliant Rehabilitation to use its patients,

including those with advanced dementia, as a means of falsely inflating its reimbursement claims

to Medicare. Marquis officials prioritized the increase in Medicare revenues and overlooked the

fact that Reliant failed to timely conduct CORI checks on therapists providing services to elderly

and disabled patients, and likewise failed to ensure that its therapists received initial and annual

dementia care training, as required under Massachusetts law.  Marquis executives referred to the

contract therapists working in Marquis facilities as "money makers," and conspired with Reliant

to place all patients covered by Medicare Part A into the Ultra RUC category of therapy

treatment as a means to falsely drive up Medicare billings.

72.    Marquis Health Service assigned an MDS Coordinator at each of its facilities.

The Marquis MDS Coordinators work closely with the Reliant Rehabilitation DORs to compile

and complete the required MDS forms, to determine patient RUG levels, and to track the

resulting HIPPS codes that are used to calculate Marquis Health Services' claims to Medicare.

73.    The Marquis MDS Coordinators report to the Vice President of Case

Management at Marquis Health Services.  Over the course of 2018, the Marquis Vice President

of Case Management encouraged and pressured the Marquis MDS Coordinators, and other

Marquis personnel, to implement the various schemes to overbill Medicare by accepting and

endorsing Reliant Rehabilitation plans of care and treatment records for physical, occupational, and speech therapy services that were unnecessary, unreasonable, or simply never provided.

74.    Marquis Health Services also assigned a Medical Director at each of its facilities to review and approve the therapy care plans prepared by Reliant Rehabilitation.  In practice, the Marquis Medical Directors exercise no meaningful control over the Reliant plans of care, and make no effort to verify if such therapy is "medically necessary" for the individual patients.

75.    The required physician certifications and recertifications for therapy services are often reviewed in bulk sets by the Marquis Medical Director and are then approved in bulk with no substantive review.  At times, those certifications and recertifications are added to patient files weeks after Reliant Rehabilitation has already been providing therapy services to a Medicare patient, typically at the Ultra High RUC level.

76.    The Marquis Health Services MDS Coordinator and other Marquis officials work with the Reliant Regional Director and other Reliant officials to schedule unnecessary evaluations and cognitive tests as a means for artificially extending patient stays at Marquis facilities until targeted Medicare billing opportunities could be obtained or exhausted.

77.    Since December 2017, Marquis Health Services has knowingly submitted and continues to submit multiple false Minimum Data Sets to Medicare which incorporate fraudulently inflated and fabricated amounts of therapy provided to its patients by Reliant Rehabilitation.  Marquis Health Services has also submitted multiple false and/or fraudulent claims to the Medicare Health Insurance Prospective Payment System that incorporate fraudulently inflated RUG levels for its patients.   These practices, applied across the 2,400 patients in Marquis Health System facilities, have resulted in millions of dollars of damages to the United States.

**Examples of False and/or Fraudulent Therapy Billings**

78.     Through their assigned duties at the Marquis Health Services skilled nursing
facility in Lancaster, Massachusetts, Relators are familiar with the following examples of the
ongoing schemes used by Reliant Rehabilitation and Marquis Health Services to create and
submit false and fraudulent Medicare claims for therapy services that are unnecessary,
unreasonable, or simply never provided.

**River Terrace Patient R.G.**

79.     Patient R.G. is a long-term care resident at Marquis River Terrace skilled nursing
facility with advanced dementia.  Patient R.G. started on therapy services on 6/30/18 following a
qualifying hospital stay for a broken hip which activated his Medicare Part A benefits.  Relator
Christopher Landry, who was then the River Terrace Director of Rehabilitation, evaluated patient
R.G. and scheduled him to receive 500 minutes of therapy a week (level RVC) to be split
between occupational, physical, and speech therapy services.  The RVC level of 500 minutes
was set in light of R.G.'s clinical needs and his physical and mental abilities.

80.     When Relator Christopher Landry was terminated in July 2018, the replacement
Reliant Rehabilitation DOR immediately increased patient R.G.'s schedule to 720 minutes of
therapy per week (level RUC), although there had been no change in R.G.'s clinical status.  The
extended length of the individual therapy sessions were beyond R.G.'s physical or mental
tolerance as a patient with advanced dementia, dysphagia, and a broken hip.

81.     Reliant Rehabilitation continued to schedule R.G. for the unreasonable and
unnecessary amount of 720 minutes of therapy for the billing periods 7/7/18 – 7/13/18 and
7/14/18 – 7/20/18.  R.G.'s patient records show that, as of 7/20/18, the aggregate amount of
therapy R.G. had received during that period equaled 719 minutes, meaning Reliant and Marquis
could not bill Medicare for therapy services at the RUC category level.  The Reliant DOR then

fraudulently added 5 minutes of "therapy" services to R.G.'s patient records so that all of the therapy time could be falsely billed at the increased RUC rate.

82.    Reliant Rehabilitation continued to improperly schedule and bill R.G. for 720 minutes of therapy for the periods 7/21/18-7/27/18 and 7/28/18 – 8/1/18 (8/1 being the 30-day reference period for R.G.).  After 30 days of treatment, R.G. should have been discharged from occupational therapy services and his total therapy should have been reduced to RHC level (325-499 minutes).   Instead, Reliant continued to schedule occupational therapy services and to bill R.G. at the RUC level for the periods 8/2/18-8/8/18 and 8/9/18-8/15/18.  R.G.'s patient records show that Reliant officials once again fraudulently added therapy minutes to his records on 8/13 and on 8/15 to ensure that all of the therapy time during the applicable period could be falsely billed at the highest RUC level.

83.    During the relevant time period the daily Medicare therapy reimbursement rates in Worcester County were:

    RUC- $693.45 (720 minutes of therapy per week)
    RVC- $594.90 (500 minutes of therapy per week)
    RHC- $518.37 (325 minutes of therapy per week)

84.     Reliant Rehabilitation and Marquis Health System's fraudulent scheme resulted in the following overbilling of Medicare for treatment of patient R.G. through 8/15/18:

    7/07/18 – 7/13/18    $689.85   (daily rate falsely increased by $ 98.55/day)
    7/14/18 – 7/20/18    $689.85   (daily rate falsely increased by $ 98.55/day)
    7/21/18 – 7/27/18    $689.85   (daily rate falsely increased by $ 98.55/day)
    7/28/18 – 8/01/18    $492.75   (daily rate falsely increased by $ 98.55/day)
    8/02/18 – 8/08/18    $1225.70 (daily rate falsely increased by $175.08/day)
    8/09/18 – 8/15/18    $1225.70 (daily rate falsely increased by $175.08/day)

    Total Overbilling:    $5,013.70

85.    Marquis Health Services' claims to Medicare for these services were both false and fraudulent because the claims included minutes of therapy that were never provided and

because the treatment of patient R.G. at the Ultra High RUC level was neither reasonable nor necessary.

86.     There is every indication that Reliant Rehabilitation and Marquis Health Services continued to schedule and bill Medicare for the unreasonable RUC level of therapy services for patient R.G. after 8/15/2018.

**River Terrace Patient J.B.**

87.     Patient J.B. was a short-term rehab patient at the Marquis River Terrace skilled nursing facility who was covered by Medicare Part A.  J.B began receiving therapy services on 7/6/2018 as a result of a lumbar compression fracture. In keeping with Reliant's policy of placing every Medicare Part A patient in the highest RUC level, the Reliant DOR who replaced Relator Christopher Landry in July 2018 scheduled patient J.B. for 720 minutes of therapy, including individual physical therapy in sessions of up to 75 minutes in length.

88.     At the end of the first week (7/13/18), Relator Matt Amico, who was the treating physical therapy assistant for J.B., reported back to the Reliant DOR that J.B. had refused to leave her room or to participate in therapy sessions on several occasions during the preceding week.  Relator Amico also reported that the scheduled sessions of 75 minutes of physical therapy were beyond what J.B. could tolerate and specifically requested that the sessions be reduced in length to 60 minutes or less.

89.     The Reliant DOR disregarded the information and the request and continued to schedule J.B. at the maximum RUC level, even increasing J.B.'s individual sessions to as long as 80 minutes in length during the following week in order to reach the 720 minute level required to bill at the RUC rate.

90.     J.B.'s patient records show that on 7/21/18 a different therapist (not Mr. Amico) provided 10 minutes less than the scheduled session, with a result that J.B.'s total minutes for

that week were below the 720 minute mark.  The Reliant DOR then fraudulently added 10

minutes of "therapy" to J.B.'s records on 7/23/2018 in order to reach the RUC billing level.  The

same patient records show that J.B.'s individual sessions were also increased to as long as 95

minutes so that the total therapy services would reach the 720 minute mark.

91.     J.B.'s patient records for the period 8/7/18 – 8/13/18 show that, after certain

physical therapy minutes could not be billed on 8/11/18, Reliant then "ramped up" J.B.'s

scheduled sessions even higher – to as long as 105 minutes per session.  In total, J.B. was

scheduled to receive 3 hours and 15 minutes of therapy in a single day – a wholly unreasonable

quantity for a patient in her condition.  The therapy sessions were increased to trigger the highest

billing RUC billing level.

92.     Using the above-quoted reimbursement rates for Worcester County, Reliant

Rehabilitation and Marquis Health System's fraudulent scheme resulted in the following

overbilling of Medicare for the treatment of patient J.B through 8/13/18:

> 7/06/18 – 7/13/18 - $788.40 (daily rate falsely increased by $ 98.55/day)
> 7/14/18 – 7/20/18 - $689.85 (daily rate falsely increased by $ 98.55/day)
> 7/21/18 – 7/23/18 - $295.65 (daily rate falsely increased by $ 98.55/day)
> 7/24/18 – 7/30/18 - $689.85 (daily rate falsely increased by $ 98.55/day)
> 7/31/18 – 8/6/18 -   $689.85 (daily rate falsely increased by $ 98.55/day)
> 8/07/18 – 8/13/18 - $689.85 (daily rate falsely increased by $ 98.55/day)
>
> Total Overbilling:      $3,843.45

93.     Marquis Health Services' claims to Medicare for these services were both false

and fraudulent because the claims included minutes of therapy that were never provided, and

because the treatment of patient J.B. at the Ultra High RUC level was neither reasonable nor

necessary.

**River Terrace Patient E.B.**

94.　　Patient E.B. is a long-term care patient in the dementia unit at Marquis River Terrace skilled nursing facility who was covered by Medicare Part B.　In June 2018, E.B. began receiving physical therapy services due to knee pain and decreased ambulation.　Relator Christopher Landry, who was then the Director of Rehabilitation, evaluated E.B. and scheduled her to receive individual physical therapy sessions that were 40 minutes in length, beginning on 6/8/18.

95.　　Once Relator Christopher Landry was terminated, however, the replacement Reliant DOR increased E.B.'s physical therapy sessions to between 60 minutes and 100 minutes per day, lengths of time well beyond her physical or cognitive abilities.　Because she was covered by Medicare Part B, the Reliant official also switched E.B. to group therapy sessions as a means of leveraging Medicare billing opportunities, even though E.B was not an appropriate candidate for receiving treatment in a group setting due to her cognitive impairment, constant need for redirection, and ability to only follow one-step commands.

96.　　E.B.'s patient records show that on 7/7/18 a re-evaluation was conducted and that the evaluating physical therapist recommended that E.B. continue to receive physical therapy only through 7/16/18, at which point she should have been discharged from that treatment. Nevertheless, Reliant continued to schedule E.B. for physical therapy services through at least 8/15/2018 and, in all likelihood, beyond that date.

97.　　In 2018, the daily Medicare therapy reimbursement rates in Massachusetts for the relevant physical therapy treatments were:

    97116- Gait training-　　　$32.27 per unit (one unit = 15 minutes)
    97110- Therapeutic Exercise- $32.65 per unit
    97530- Therapeutic Activity-  $43.42 per unit

Average per 3 codes above-   $36.11 per unit/15 minute segment

98.     Counter to the recommendation of her treating physical therapist, the Reliant

DOR continued to schedule physical therapy services for E.B. during the period 7/16/18 through

8/15/18 (and likely beyond).  Patient records show E.B. received an average of 4 units of

physical therapy per day, and occasionally more, during that time.  Using the average of the

above-quoted reimbursement rates, Reliant Rehabilitation and Marquis Health System's

fraudulent scheme resulted in the following overbilling of Medicare for physical therapy

treatment of patient E.B. through 8/15/18:

| | |
|---|---|
| 7/16/18 – 7/22/18 | $577.76 |
| 7/23/18 – 7/29/18 | $577.76 |
| 7/30/18 – 8/05/18 | $577.76 |
| 8/06/18 – 8/12/18 | $577.76 |
| 8/13/18 – 8/15/18 | $577.76 |

Total Overbilling:  $2,888.80

99.     Marquis Health Services' claims to Medicare for these services were false and/or

fraudulent because the physical therapy treatment of patient E.B. was neither reasonable nor

necessary.

100.    On 6/26/18, patient E.B. began to receive occupational therapy treatment due to a

decline in self-care skills and ability to perform functional transfers.  By regulation, a

recertification for that treatment was required on 7/26/18.  E.B.'s patient records show no such

recertification was completed until 7/31/18.

101.    Further examination of E.B.'s records reveal that, as part of her 30-day

evaluation, the evaluating occupational therapist noted that E.B. was not progressing and that her

functional status was exactly the same as when she began treatment.  This should have resulted

in E.B. being discharged from occupational therapy treatment.   Instead, the Reliant DOR

continued to schedule and bill E.B. for occupational therapy, including combined sessions of 85 minutes in a single day - an amount well beyond her cognitive ability. The corresponding patient notes for that particular day (8/16/18) confirm that E.B. became "agitated and confused" during the treatment sessions. The Reliant DOR continued to schedule E.B. for occupational therapy through at least 8/28/18, and likely beyond that date.

102.    In 2018, the daily Medicare therapy reimbursement rates in Massachusetts for the relevant occupational therapy treatments were:

| | | |
|---|---|---|
| 97535- Self-Care | $36.88 per unit | |
| 97110- Therapeutic Exercise | $32.65 per unit | |
| 97530- Therapeutic Activity | $43.42 per unit | |
| | | |
| Average per 3 codes above- | $37.65 per unit/15 minute segment | |

103.    Despite being told that she was making no progress after 30 days, Reliant continued to provide unreasonable and unnecessary occupational therapy services to E.B. during the period 7/26/18 through 8/28/18 (and likely beyond). Patient records show E.B. received an average of 4 units of occupational therapy per day, at a rate of 4 days a week, during that time. Using the average of the above-quoted reimbursement rates, Reliant Rehabilitation and Marquis Health System's fraudulent scheme resulted in the following overbilling of Medicare for the treatment patient E.B. through 8/28/18:

| | |
|---|---|
| 7/26/18 – 8/01/18 | $602.40 |
| 8/02/18 – 8/08/18 | $602.40 |
| 8/09/18 – 8/15/18 | $602.40 |
| 8/16/18 – 8/22/18 | $602.40 |
| 8/23/18 – 8/28/18 | $602.40 |
| | |
| Total Overbilling: | $3,012.00 |

104.    Marquis Health Services' claims to Medicare for these services were false and/or fraudulent because the occupational therapy treatment of patient E.B. was neither reasonable nor necessary.

**River Terrace Patient J.M.**

105.    Patient J.M.  is a long- term care patient in the dementia unit at the Marquis River Terrace skilled nursing facility who was covered by Medicare Part B.  On 6/28/18, J.M. began receiving occupational therapy services due to a decline in self-feeding skills and to address wheelchair seating and positioning needs.

106.    While the initial evaluation for J.M. is dated 6/28/18, her patient records reveal that the Marquis Health Services nursing staff failed to request authorization to evaluate J.M. until 7/3/18, and that the Marquis Medical Director did not issue that authorization until 7/12/18, almost two weeks after J.M.'s evaluation.  J.M.'s patient records also show that additional required therapy orders were either entered late, signed late, or not entered at all.  These failures to timely obtain required medical authorization is symptomatic of the ineffectual oversight of Reliant's therapy services provided by Marquis Health Services' medical personnel.

107.    A re-evaluation of patient J.M. occurred on 7/26/18, following four weeks of occupational therapy.  In that report, the evaluating occupational therapist noted that J.M. was not progressing and that her functional status was exactly the same as when she began treatment. This should have resulted in J.M. being discharged from occupational therapy treatment. Instead, Reliant Rehabilitation continued to schedule and bill J.M. through and after 8/13/18. The therapy re-certification record for J.M. contains almost no patient-specific information. Most of that document appears to have been auto-filled via the "build" feature contained in the Rehab Optima patient record system used by Reliant Rehabilitation personnel.  The re-

certification lacks detail or substance and fails to establish the necessity of continued occupational therapy services for patient J.M.

108.    J.M. was not an appropriate candidate for group therapy services as she was unable to follow any verbal commands and required constant one-on-one attention and visual instruction to perform any directed tasks. Patient records reveal that, despite J.M.'s advanced dementia and impaired cognitive status, Reliant Rehabilitation placed her into group therapy sessions as a means of leveraging its Medicare billing opportunities.

109.    In 2018, the daily Medicare therapy reimbursement rates in Massachusetts for the occupational therapy treatments provided to J.M. was $37.65 per unit.  Patient records show that J.M. received an average of 2-3 units (30-45 minutes) of occupational therapy services per day, 4 times per week, for the period 7/26/18 – 8/16/18.   Using the average of the previously quoted reimbursement rates, Reliant Rehabilitation and Marquis Health System's fraudulent scheme resulted in the following overbilling of Medicare for the treatment of patient J.M through 8/16/18:

| | |
|---|---|
| 7/27/18 – 8/02/18 | $451.80 ($112.95/day x 4 days) |
| 8/03/18 – 8/09/18 | $301.20 ($75.30/day x 4 days) |
| 8/10/18 – 8/16/18 | $301.20 ($75.30/day x 4 days) |
| Total Overbilling | $1,054.20 |

110.    Marquis Health Services' claims to Medicare were false and/or fraudulent because the occupational therapy treatment of patient J.M. was neither reasonable nor necessary.

**River Terrace Patient L.C.**

111.    Patient L.C. was admitted to River Terrace in May 2018 for short-term rehabilitation following a qualifying hospital stay which activated her Medicare Part A benefits. Patient L.C.'s hospital stay involved the amputation of the lower portion of one of her legs.

112.    Upon arrival at the River Terrace facility, L.C. received 720 minutes of therapy, which included both physical therapy services and occupational therapy services, during each of the first seven weeks of her stay.  The therapy services allowed L.C. to become independent at a wheelchair level pending the fabrication of her prosthetic leg.

113.    On or about 7/17/18, the treating physical therapist and occupational therapist both recommended that L.C. be discharged from continued therapy no later than 7/24/18 to allow L.C. to conserve her remaining eligibility for therapy services until after she had been fitted with her prosthetic leg.  This approach would have allowed the treating team to maximize therapy services to L.C. after she was fitted with her permanent leg and to assist her in adjusting to mobility with a prosthetic limb.  The treating team further observed that L.C. was fully capable of residing in a one-level home with her adult son pending that operation and that she did not need, and would not benefit from, additional time at the River Terrace facility.

114.    Neither Reliant Rehabilitation nor Marquis Health Services heeded the request of L.C.'s treatment team that she be discharged from the River Terrace facility.  The Reliant DOR who replaced Relator Christopher Landry continued to schedule L.C. at the RVB level (500 minutes per week), indifferent to the fact that doing so would, effectively, exhaust her eligibility for critical post-operative therapy services.

115.    Using the previously quoted RUG reimbursement rates, Reliant Rehabilitation and Marquis Health Services' fraudulent scheme resulted in the following overbilling of Medicare for the treatment of L.C. through 8/13/18:

    7/24/18 – 7/30/18 – $3,606.12 (RVB) $515.16/day x 7 days
    7/31/18 – 8/06/18 – $3,606.12 (RVB) $515.16/day x 7 days
    8/07/18 – 8/13/18 – $3,606.12 (RVB) $515.16/day x 7 days

    Total Overbilling:  $10,818.36

116.    Marquis Health Services claims to Medicare were false and/or fraudulent because the occupational and physical therapy treatment of patient L.C. was neither reasonable nor necessary.

117.    Defendants repeated similar false and/or fraudulent Medicare billing schemes across the Marquis Health Services system and, with respect to defendant Reliant Rehabilitation, with SNF customers across the country, resulting in many millions of dollars in damages to the United States.

**Prohibited Retaliation Against Relators by Reliant Rehabilitation and Marquis Health Services**

118.    Relator Christopher Landry served as Director of Rehabilitation at the River Terrace facility beginning in March 2018.  As the DOR, Relator Landry participated in regular meetings and telephone conferences with officials from both Reliant Rehabilitation and Marquis Health Services to review patient plans of care and to discuss "building productivity" at the River Terrace facility.  The meetings and calls included both the Reliant Rehabilitation Director of Regional Operations and the Marquis MDS Coordinator at the River Terrace facility, among others.

119.    During the weekly calls and meetings, Relator Landry resisted multiple requests and demands from senior Reliant officials and senior Marquis officials that he falsely increase therapy services for Medicare Part A patients to the Ultra RUC level, even if the patient did not need, or could not tolerate, that level of care.   Relator Landry also resisted requests and demands by those officials to schedule unnecessary evaluations and cognitive tests as a means for artificially extending patient stays at the River Terrace facility until targeted Medicare billing opportunities could be obtained or exhausted.

120.    The Reliant Regional Director of Operations frequently criticized and belittled Relator Landry in front of other employees, including employees who reported to him, for failing to comply with her instructions.  When Relator Landry still did not agree to fraudulently inflate or fraudulently extend patient treatment schedules, the Reliant Regional Director of Operations accessed the Rehab Optima system and altered Relator Landry's plans of care by falsely adding unnecessary minutes or scheduling unnecessary evaluations.  Relator Landry was further accused by senior Reliant officials of being "insubordinate."

121.    In June 2018, Reliant Rehabilitation imposed unrealistic and unattainable S/I productivity demands on all therapists, and then pressured therapists to meet those demands by using inappropriate groups of patients to create opportunities for simultaneously and inappropriate billing.  Relator Landry emailed his superiors at the Reliant Rehabilitation offices in Texas and explained that several therapists assigned to the River Terrace facility were "taken aback" by Reliant's grouping demands.  In response, the Reliant Regional Director of Operations instructed Relator Landry that grouping "must be done" and that, if current therapists would not comply with Reliant's demands, they would be replaced by new employees who would.

122.    Later in June 2018, Relator Landry contacted senior officials at the Reliant Rehabilitation offices in Texas and explained that several therapists at the River Terrace facility had raised concerns over the possibility of being sanctioned by the State of Massachusetts, or losing their therapist licenses, if they complied with Reliant's demands to use inappropriate grouping and concurrent treatments as a means for increasing billing opportunities.  Relator Landry asked the Reliant officials to provide him and his team with training and materials on the applicable Medicare guidelines for group and concurrent therapy treatments.  Less than two weeks later, Relator Landry was placed on administrative leave by Reliant Rehabilitation.

-38-

Relator Landry was then terminated by letter and without explanation. Reliant Officials later told Relator Landry's colleagues that Mr. Landry had been fired because he "did not fit in with the company" and because "corporate wanted to go in a different direction."

123.    Relator Roseanne Hunter worked as a Rehabilitation File Clerk at the River Terrace facility for several years prior to Reliant Rehabilitation's arrival in December 2017. Reliant Rehabilitation did not provide Relator Hunter with an official email account or a mobile telephone, requiring her to use a pre-existing email account and a personal telephone to communicate with Reliant officials in Texas and other locations to carry out her official duties. On numerous occasions between December 2017 and June 2018, Reliant officials, including the Reliant Regional Director of Operations, asked and directed Relator Hunter to email and/or to text them specific information relating to patients at the Marquis River Terrace facility, and Relator Hunter complied with those requests and directives in carrying out her assigned duties.

124.    In June 2018, Relator Hunter raised concerns to several Marquis officials, including the on-site Marquis Manager, over the unattainable productivity demands that Reliant Rehabilitation was imposing on the individual therapists working at the River Terrace facility. Within weeks, the Reliant Regional Director of Operations sent out an email indicating that Relator Hunter's position at the River Terrace facility was under review.

125.    In July 2018, Relator Hunter learned that the Reliant DOR who replaced Relator Christopher Landry was improperly certifying and re-certifying plans of care for patients without examining or evaluating those patients. Relator Hunter reported that activity to the on-site Marquis Manager of the River Terrace facility. Several days later, Relator Hunter was told by the Reliant Regional Director of Operation and by a second Reliant Official that the use of her email account constituted a violation of federal law, including HIPPA. Relator Hunter explained

that she had been using that account to communicate with Reliant officials, and to complete

assignments at the request of those officials, for more than six months.  Nevertheless, the Reliant

Regional Director of Operations threatened Relator Hunter with legal action, demanded that she

turn over control of her email account, and proceeded to reset the password to Relator Hunter's

account without her permission.

126.     Later in July 2018, Relator Hunter learned that the Reliant DOR who replaced

Relator Christopher Landry had instructed one or more Reliant therapists to conduct evaluations

and develop plans of cares for patients without consideration of the medical condition or medical

need of the individual patients.  The group included River Terrace patients whose health care

proxies had stated that they should not receive any therapy services.  The group also included a

River Terrace patient who was in hospice care.  Relator Hunter also learned that the Reliant

DOR was continuing to create therapy plans of care for patients who had never been evaluated.

Relator Hunter reported the misconduct to the Marquis Staff Development Coordinator and the

Marquis Director of Nursing at the River Terrace facility.

127.     In July 2018, Relator Hunter prepared a submission to the Reliant Rehabilitation

internal compliance group detailing the foregoing information.  Prior to formally filing that

submission, Relator Hunter learned that the Reliant Rehabilitation compliance group was not an

independent body and, in fact, that it included the same Reliant officials who were demanding

that Reliant workers engage in fraudulent conduct and who had already threatened that her job

was "under review."

128.     A week after she had reported Reliant's fraudulent conduct to the Marquis Staff

Development Coordinator and the Marquis Director of Nursing, Relator Hunter was instructed

by the Reliant DOR that she was required to participate in a conference call with two Reliant

officials based in Texas.  During that call, the Reliant officials informed Relator Hunter that her

position was being eliminated and that her employment with Reliant Rehabilitation was

terminated, effective immediately. The Reliant officials instructed Relator Hunter not to speak

with any personnel in the River Terrace building.  The replacement Reliant DOR then escorted

Relator Hunter to her desk to retrieve her personal effects and, thereafter, escorted Relator

Hunter out of the River Terrace building.

129.    Relator Tiffany Hayes served as the DOR for the River Terrace facility for several

months in early 2018.  After March 2018, Relator Hayes worked on a part time basis as an

Occupational Therapist at the River Terrace facility, where she had worked, on and off, for

several years prior to Reliant Rehabilitation's arrival in December 2017.

130.    In May 2018, Reliant Rehabilitation announced new and increased S/I

productivity requirements for each of its therapists.  Relator Hayes became concerned that

Reliant officials were, in effect, pressuring therapists to falsify patient treatment records to meet

those productivity demands.  Relator Hayes expressed her concerns over Reliant Rehabilitation's

productivity demands to the Marquis Manager of the River Terrace facility. Several days later,

Reliant Rehabilitation officials removed Relator Hayes' ability to access the Rehab Optima

patient record system.

131.    After Reliant Rehabilitation suspended Relator Landry as the DOR at the River

Terrace facility in early July 2018, Relator Hayes met with the Marquis Manager, the Marquis

Staff Development Coordinator and the Marquis Director of Nursing to alert them that Relator

Landry had been terminated because he would not comply with demands to inflate therapy plans

of care and to use grouping as a means for overbilling Medicare. The Marquis Manager informed

Relator Hayes that Marquis could not get involved because Reliant Rehabilitation was a contract company.

132.    Within weeks, Relator Hayes was removed from the rotation of therapists at the River Terrace facility.  Later in July 2018, Relator Hayes confronted the Reliant Regional Director of Operations during a face to face meeting to ask why her name no longer appeared on the rotation of therapists.  The Reliant Regional Director of Operations claimed that the removal of Relator Hayes's name was "an oversight."  Relator Hayes's name was never restored to the rotation of therapists, and she was effectively terminated from her position as an Occupational Therapist at the River Terrace facility.

133.    Relator Matthew Amico worked as a certified physical therapy assistant at the Marquis River Terrace facility.  In early July 2018, Relator Amico was instructed by the Reliant DOR who replaced Relator Christopher Landry to initiate electrical stimulation on a dementia patient and to then leave the room to conduct a simultaneous physical therapy session with a different patient in a different location, as a means for increasing his S/I productivity level. Relator Amico believed this course of treatment was improper and unethical, and reported the matter to the Marquis Manager of the River Terrace facility, who directed Mr. Amico to use the Reliant Rehabilitation compliance telephone line.

134.    Shortly thereafter, Relator Amico called and left a message on what was purportedly the internal Reliance Rehabilitation compliance line. The Reliant official who responded did not treat the matter as a potential compliance issue and, instead, directed Relator Amico to another physical therapist at a different Reliant facility who could coach Relator Amico on strategies for simultaneous billing.  Several days later, the replacement Reliant DOR

told Relator Amico and other therapists at the River Terrace facility that, through "creative" use of grouping, they could achieve S/I productivity levels of up to 160%.

135.    Later in July 2018, Relator Amico met face to face with the Reliant Regional Director of Operations and a second Reliant official who had traveled up from Texas to Massachusetts.  During that meeting, Relator Amico questioned the validity and legality of the Reliant Rehabilitation productivity demands and billing policies.  Relator Amico also expressed concern that he was being harassed by the Reliant DOR and that, he believed, he had been targeted for termination.  Relator Amico was told by the Reliant officials that they would look into the situation and get back to him.  Mr. Amico never heard from either of them again.

136.    In August 2018, Relator Amico attended a meeting with the Marquis Health Services Vice President of Case Management. During that meeting, the Marquis V.P. of Case Management told Mr. Amico and the other Reliant workers in attendance that she had looked through all the RUG level/billing/documentation issues that had been questioned and stated that "everything looked good" and that she had "no concerns."  Relator Amico raised separate concerns over Reliant Rehabilitation's unrealistic productivity goals.  The Marquis V.P. of Case Management told Mr. Amico that she would look into the matter.  Mr. Amico never heard from her again.

137.    Several weeks after reporting his concerns to the Marquis V.P for Case Management, Relator Amico was informed by the Reliant Rehabilitation Human Resources Department that he was being put on administrative leave due to an alleged violation of company information technology policy, a charge which Mr. Amico directly disputed.  Thereafter, Mr. Amico was terminated by letter notification.

138.    Relator Henrick Hamberg worked as a certified physical therapy assistant at the Marquis River Terrace facility.  In June 2018, Reliant Rehabilitation issued several directives increasing the S/I productivity levels demanded from each therapist.  Reliant Rehabilitation also decreed that patient grouping "must be done" and instructed therapists to use groups as a means to leverage billing opportunities and to (falsely) increase their daily S/I levels.

139.    In July 2018, Relator Hamberg placed a call to the Marquis Health Services compliance line.  Relator Hamberg explained that he was a therapist at the River Terrace facility in Lancaster, Massachusetts and that he and other therapists were being pressured to falsify treatment and billing records in order to satisfy Reliant Rehabilitation's unrealistic S/I productivity requirements.  Relator Hamberg explained that he had been encouraged to use the Marquis Compliance line instead of reporting the matter directly to the Massachusetts Attorney General's Office.  Mr. Hamberg never received a response.

140.    Later in July 2018, Relator Hamberg discovered that the Reliant DOR who replaced Relator Christopher Landry had repeatedly falsified treatment records for one of his patients by inflating therapy minutes and by misreporting non-therapy activities as billable therapy services.  Relator Hamberg reported the fraudulent activity to the Marquis Building Manager for the River Terrace facility.

141.    Within weeks of reporting the fraudulent activities by the Reliant Rehabilitation DOR, Relator Hamberg was removed from the rotation of therapists at the River Terrace facility.  When Relator Hamberg called the Reliant official who maintained that list, she claimed to have "no idea" why his name had been removed.  Relator Hamberg's name was never restored to the rotation of therapists and he was effectively terminated from his position as a Physical Therapy Assistant at the River Terrace facility.

142.    Relator Devon Edlin worked as a certified occupational therapy assistant at the Marquis River Terrace facility.   In June 2018, Reliant Rehabilitation issued several directives increasing the S/I productivity levels demanded from each therapist.  Relator Edlin became concerned that, in order to meet Reliant's unrealistic productivity goals, she was being pressured to inflate treatment records and to misrepresent administrative and other time as therapy treatment time, which she refused to do.  Relator Edlin also became concerned that Reliant was mandating group therapy treatment without any regard to whether the patient could benefit from that type of therapy or whether the therapy was either necessary or appropriate.

143.    In July 2018, the Reliant DOR who replaced Relator Christopher Landry told Relator Edlin that she could reach a productivity level of 160% through grouping and pressed her to be more "creative" with placing patients, including dementia patients, into groups.  Later in July 2018, Relator Edlin participated in a call with the Reliant Regional Director of Operations who told the group of therapists that they could all achieve productivity levels of 160%.  When the therapists questioned whether there was a requirement that group treatment must benefit the individual patients, the Reliant Regional Director of Operations repeated that grouping needed to be done, and threatened the therapists that if they did not become more productive, they would be replaced by new therapists who would be.

144.    Also in July 2018, Relator Edlin discovered that the replacement Reliant DRO was scheduling Medicare patients for occupational therapy services without first conducting a patient evaluation, or by using false and fabricated patient evaluation records.  Relator Edlin reported that misconduct to the Marquis Manager of the River Terrace facility.  Later in July 2018, Relator Edlin discovered that at least 8 of her patients were out of compliance because their files lacked the necessary certifications and recertifications to support continued therapy

services.  Relator Edlin contacted both the Reliant compliance line and the Marquis Health

Services compliance line to report that situation.  Ms. Edlin received a response from the

Marquis Compliance group informing her that the situation would be corrected.  Ms. Edlin never

received any response from the Reliant compliance group.

145.    Also in July 2018, Relator Edlin participated in a conference call with senior

Reliant Rehabilitation officials based in Texas.  During that conference call, the Reliant officials

were asked whether Reliant's compliance program was an independent body and, eventually,

admitted that it was not.

146.    In August 2018, Relator Edlin attended a meeting with the Marquis Health

Services Vice President of Case Management.  During that meeting, the Marquis V.P. of Case

Management told Ms. Edlin and the other Reliant workers in attendance that she had looked

through all the RUG level, billing and patient documentation issues that had been questioned and

stated that "everything looked good" and that she had "no concerns."  The Marquis V.P. of Case

Management then challenged the group what she had to do to "get the compliance calls to stop."

147.    In September and October of 2018, Reliant officials repeatedly pressed Relator

Edlin to tender a letter of resignation.  The same Reliant officials also tried to revoke approval

for Relator Edlin's previously authorized vacation time.  Later in October 2018, Relator Edlin's

name was removed from the rotation of occupational therapy assistants and she was effectively

terminated from her job at the River Terrace facility.

## CLAIMS FOR RELIEF

### Count I

### Federal False Claims Act – False Claims
### 31 U.S.C. § 3729(a)(1)(A) (2009)

148.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

149.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended.

150.   By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

151.   The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

152.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

153.   Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

### Count II

### Federal False Claims Act – False Records or Statements
### 31 U.S.C. § 3729(a)(1)(B) (2009)

154.   Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

155.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

156.     By and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

157.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

158.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

159.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

### Count III

**Federal False Claims Act – Reverse False Claims**
**31 U.S.C. § 3729(a)(1)(G) (2009)**

160.     Relators reallege and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

161.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

162.     By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and they have concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicare for which Defendants knew they were not entitled to and therefore refunds were properly due and owing to the United States.

163.    The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

164.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

165.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## Count IV

### Federal False Claims Act - Conspiracy
### 31 U.S.C. § 3729(a)(1)(C) (2009)

166.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

167.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

168.    By and through the acts described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G). Further to Defendants' conspiracy and fraudulent scheme, despite knowing that payments from the federal government have been received in violation of the False Claims Act, Defendants have refused and failed to refund these payments and have continued to submit false or fraudulent claims, statements, and records to the United States.

169.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

170.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

-49-

171.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## CLAIMS FOR RELIEF ON BEHALF OF THE RELATORS PERSONALLY

172.    Each individual Plaintiff-Relator further seeks to recover damages and other relief from Defendants for personal claims of retaliation and wrongful termination.

### Federal and State Law Prohibiting Retaliation

173.    The Federal False Claims Act includes a separate provision protecting individuals (including relators) from retaliation:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C § 3730(h)(1).  The FCA further provides that any person who is subjected to such retaliation is entitled to 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, as well reinstatement with the seniority status that that employee, contractor, or agent would have had but for the discrimination.  31 U.S.C. § 3730(h)(2).

174.    The Massachusetts Protection from Retaliatory Action by Health Care Facilities Act, Mass. Gen. Laws c. 149, § 187, prohibits a health care facility from taking retaliatory action, including harassment, suspension, or discharge, against a health care provider who objects to, or refuses to participate in, an activity or practice that he or she reasonably believe

violates any laws, rules, regulations, or professional standards. A heath care provider who is subjected to such retaliatory action by a health care facility is entitled to lost wages, benefits and other remuneration, and interest thereon, as well as reimbursement for reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees, among other remedies.  Mass Gen. Laws c. 149, § 187(b)(4).

175.     Plaintiffs-Relators Matthew Amico, Devin Edlin, Henrick Hamberg, Tiffany Hayes, Roseanne Hunter, and Christopher Landry are each health care providers as defined under the Massachusetts Protection from Retaliatory Action by Health Care Facilities Act.  *See* Mass Gen. Laws c. 149, § 187(a).  Defendants Reliant Rehabilitation Holdings, Inc. and Marquis Health Services, and their respective parent companies, are each health care facilities under that Act. *Id.*

## Count V

### Retaliation Against Relator Matthew Amico In Violation of The False Claims Act 31 U.S.C. § 3730(h)

176.     Plaintiff-Relator Matthew Amico realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

177.     As set forth above, Defendants harassed, discriminated against, threatened, and ultimately terminated the employment of Plaintiff-Relator Matthew Amico because of lawful acts he undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

178.     Defendants' retaliation and discrimination has inflicted damages on Relator Matthew Amico including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses,

humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

179.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Matthew Amico is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count VI

### Retaliation Against Relator Matthew Amico In Violation of Mass Gen. Laws Chapter 149, § 187

180.    Plaintiff-Relator Matthew Amico realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

181.    As set forth above, Defendants harassed, suspended, discharged and took other adverse actions against Plaintiff-Relator Matthew Amico because he objected to, and refused to participate in, Defendants' activities and practices which, he reasonably believed, were in violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

182.    Defendants' retaliatory actions against Plaintiff-Relator Matthew Amico were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

183.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Matthew Amico including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

184.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Matthew Amico is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count VII

### Retaliation Against Relator Devon Edlin In Violation of The False Claims Act
### 31 U.S.C. § 3730(h)

185.    Plaintiff-Relator Devon Edlin realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

186.    As set forth above, Defendants harassed, discriminated against, threatened, and ultimately terminated the employment of Plaintiff-Relator Devon Edlin because of lawful acts she undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

187.    Defendants' retaliation and discrimination has inflicted damages on Relator Devon Edlin including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

188.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Devon Edlin is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count VIII

**Retaliation Against Relator Devon Edlin In Violation of Mass Gen. Laws
Chapter 149, § 187**

189.    Plaintiff-Relator Devon Edlin realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

190.    As set forth above, Defendants harassed, suspended, discharged and took other adverse actions against Plaintiff-Relator Devon Edlin because she objected to, and refused to participate in, Defendants' activities and practices which, she reasonably believed, were in violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

191.    Defendants' retaliatory actions against Plaintiff-Relator Devon Edlin were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

192.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Devon Edlin including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

193.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Devon Edlin is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count XI

**Retaliation Against Relator Henrick Hamberg In Violation of The False Claims Act**
**31 U.S.C. § 3730(h)**

194.    Plaintiff-Relator Henrick Hamberg realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

195.    As set forth above, Defendants harassed, discriminated against, threatened, and ultimately terminated the employment of Plaintiff-Relator Henrick Hamberg because of lawful acts he undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

196.    Defendants' retaliation and discrimination has inflicted damages on Relator Henrick Hamberg including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

197.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Henrick Hamberg is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count X

**Retaliation Against Relator Henrick Hamberg In Violation of Mass Gen. Laws**
**Chapter 149, § 187**

198.    Plaintiff-Relator Henrick Hamberg realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

199.    As set forth above, Defendants harassed, suspended, discharged and took other adverse actions against Plaintiff-Relator Henrick Hamberg because he objected to, and refused to participate in, Defendants' activities and practices which, he reasonably believed, were in

violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

200.    Defendants' retaliatory actions against Plaintiff-Relator Henrick Hamberg were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

201.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Henrick Hamberg including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

202.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Henrick Hamberg is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## <u>Count XI</u>

**Retaliation Against Relator Tiffany Hayes In Violation of The False Claims Act
31 U.S.C. § 3730(h)**

203.    Plaintiff-Relator Tiffany Hayes realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

204.    As set forth above, Defendants harassed, discriminated against, threatened, and ultimately terminated the employment of Plaintiff-Relator Tiffany Hayes because of lawful acts she undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

205.    Defendants' retaliation and discrimination has inflicted damages on Relator Tiffany Hayes including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

206.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Tiffany Hayes is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## **Count XII**

**Retaliation Against Relator Tiffany Hayes In Violation of Mass Gen. Laws Chapter 149, § 187**

207.    Plaintiff-Relator Tiffany Hayes realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

208.    As set forth above, Defendants harassed, suspended, discharged and took other adverse actions against Plaintiff-Relator Tiffany Hayes because she objected to, and refused to participate in, Defendants' activities and practices which, she reasonably believed, were in violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

209.    Defendants' retaliatory actions against Plaintiff-Relator Tiffany Hayes were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

210.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Tiffany Hayes including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an

amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

211.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Tiffany Hayes is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count XIII

**Retaliation Against Relator Roseanne Hunter In Violation of The False Claims Act
31 U.S.C. § 3730(h)**

212.    Plaintiff-Relator Roseanne Hunter realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

213.    As set forth above, Defendants harassed, discriminated against, threatened, and ultimately terminated the employment of Plaintiff-Relator Roseanne Hunter because of lawful acts she undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

214.    Defendants' retaliation and discrimination has inflicted damages on Relator Roseanne Hunter including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

215.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Roseanne Hunter is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count XIV

**Retaliation Against Relator Roseanne Hunter In Violation of Mass Gen. Laws Chapter 149, § 187**

216.    Plaintiff-Relator Roseanne Hunter realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

217.    As set forth above, Defendants harassed, suspended, discharged and took other adverse actions against Plaintiff-Relator Roseanne Hunter because she objected to, and refused to participate in, Defendants' activities and practices which, she reasonably believed, were in violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

218.    Defendants' retaliatory actions against Plaintiff-Relator Roseanne Hunter were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

219.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Roseanne Hunter including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

220.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Roseanne Hunter is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count XV

**Retaliation Against Relator Christopher Landry In Violation of The False Claims Act
31 U.S.C. § 3730(h)**

221.    Plaintiff-Relator Christopher Landry realleges and incorporates by reference the
allegations of the foregoing paragraphs as though fully set forth herein.

222.    As set forth above, Defendants harassed, discriminated against, threatened, and
ultimately terminated the employment of Plaintiff-Relator Christopher Landry because of lawful
acts he undertook to stop violations of, and a conspiracy to violate, the False Claims Act.
Defendants' conduct violates the FCA, 31 U.S.C. § 3730(h).

223.    Defendants' retaliation and discrimination has inflicted damages on Relator
Christopher Landry including, but not limited to, past and future earnings, lost employment
benefits (including health insurance benefits and retirement contributions), job-search expenses,
humiliation, mental anguish, and emotional distress, all collectively in an amount to be
determined at trial.

224.    Defendants' actions were knowing, malicious, willful, and with conscious
disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Christopher Landry is
further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## Count XVI

**Retaliation Against Relator Christopher Landry In Violation of Mass Gen. Laws
Chapter 149, § 187**

225.     Plaintiff-Relator Christopher Landry realleges and incorporates by reference the
allegations of the foregoing paragraphs as though fully set forth herein.

226.    As set forth above, Defendants harassed, suspended, discharged and took other
adverse actions against Plaintiff-Relator Christopher Landry because he objected to, and refused
to participate in, Defendants' activities and practices which, he reasonably believed, were in

violation of laws, rules and regulations promulgated pursuant to law, were in violation of professional standards, and posed a risk to public health.

227.    Defendants' retaliatory actions against Plaintiff-Relator Christopher Landry were and are in violation of Massachusetts General Laws, Chapter 149, § 187.

228.    Defendants' retaliation has inflicted damages on Plaintiff-Relator Christopher Landry including, but not limited to, past and future earnings and interest thereon, lost fringe benefits (including health insurance benefits and retirement contributions), lost seniority rights, job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.   Plaintiff-Relator is further entitled to the payment of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees by Defendants.

229.    Defendants' actions were knowing, malicious, willful, and with conscious disregard for Plaintiff-Relator's rights under the law.  Plaintiff-Relator Christopher Landry is further entitled to exemplary and punitive damages, in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants Reliant Rehabilitation Holdings, Inc., HIG Capital LLC, Marquis Health Service, and Tryko Partners LLC as follows:

A.    That Defendants be enjoined from submitting false and/or fraudulent Medicare claims to the Government and from otherwise violating the False Claims Act;

B.    That judgment be entered against Defendants and in favor of the United States and the Relators in an amount equal to three times the amount of damages caused by Defendants' misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

C.    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

-61-

D.      That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under the Federal FCA, 31 U.S.C. § 3730(d);

E.      That Relators be awarded the maximum amount permitted under the Federal FCA, 31 U.S.C. § 3730(d);

F.      That each Relator be awarded all available damages, prejudgment interest, fees and costs pursuant to her or  his personal claims for retaliation and wrongful termination under the federal FCA, 31 U.S.C. § 3730(h), including, without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, and compensation for any special damages and/or exemplary or punitive damages, and litigation costs, and attorneys' fees;

G.      That each Relator be awarded all available damages, prejudgment interest, fees and costs pursuant to her or his personal claims for prohibited retaliatory action under the Protection from Retaliatory Action by Health Care Facilities Act, Mass General Law, Chapter 149, § 187, including, without limitation, lost wages, benefits and other renumeration, and interest thereon, and compensation for any special damages and/or exemplary or punitive damages, and litigation costs, and attorneys' fees; and

H.      That the Court award such other relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs-Relators request a jury trial.

November 20, 2018

Respectfully submitted,

/s/ *Suzanne E. Durrell* _____

Suzanne E. Durrell (BBO #139280)
Email: suzanne@thomasdurrell.com
Bruce C, Judge (CA Bar No. 148805)
Email: bruce@thomasdurrell.com
WHISTLEBLOWER LAW COLLABORATIVE LLC
20 Park Plaza, Suite 438
Boston, MA  02116-4334
Tel: (617) 366-2800
Fax: (888) 676-7420

*Counsel for Plaintiffs-Relators*